## ATTACHMENT "C"

## Plaintiffs' Outline of the Case

This Dram Shop case involving a double-pedestrian strike with one fatality and one serious injury began when Katie Pancione walked into a Texas Roadhouse to pick up her "to-go" food order she had called in on Tuesday, June 16, 2020. Because her food was not ready, she waited at the bar and ordered one 14 oz. draft beer served to her by Texas Roadhouse bartender, Cheyenne Lee. At the time Katie Pancione ordered the beer, Plaintiffs contend she was noticeably intoxicated, so any service of an alcoholic beverage was in violation of Georgia's Dram shop statute. While Defendant denies Ms. Pancione's observable intoxication, the record shows that Ms. Pancione had Huntington's disease. Symptoms of that condition include slurred speech, unsteady gait, confusion and flat affect; thus, she could not have presented as lacking symptoms of intoxication, as Defendant claims. In fact, her blood-alcohol content was determined to be .176 at 9:48 p.m., over three hours after the fatal pedestrian strike.

Based on her known BAC, Plaintiffs contend that Ms. Pancione consumed alcohol before arriving at Texas Roadhouse and would have been noticeably intoxicated when she was served a beer at Texas Roadhouse, in violation of the Dram shop statute. Furthermore, Texas Roadhouse knew or should have known that Ms.

Pancione would soon be driving as she entered the bar/restaurant alone, with her keys in her hand, waited for 14-17 minutes and left alone.

Katie Pancione was going through a difficult divorce and had participated in a zoom hearing in that matter earlier in the day. She drove from her parents' house where she was living at 4882 Township Brow, Marrietta, Georgia to the Texas Roadhouse located at 510 Lakeland Plaza, Cumming, Georgia. The drive was 24.8 miles long and took approximately 44 minutes, mostly on Georgia Highway 400, a controlled access highway for the portion that she drove it. Ms. Pancione was on the way to visit her boyfriend, Gus Morris.

When the food was ready, approximately 14-17 minutes after she arrived, she left Texas Roadhouse and drove towards Mr. Morris's house at 116 Jason Lane (off Kelly Mill Road) in Cumming, Georgia. She was not safe to drive. Within five minutes of leaving Texas Roadhouse and 2.3 miles from the bar/restaurant, she was observed by three other motorists to be stationery and not proceeding under a green light signal, then striking the right-side curb, then crossing over the double yellow lines into oncoming traffic and then veering once again, striking the right hand curb. After all of this weaving, her car left the roadway, where she struck and eventually killed 13-year-old Leo Camacho.

Plaintiff Jose Camacho and his son, Leo, along with Leo's friend Brian Lopez were doing landscaping work at the Christ Culture Center Church located at 315

2

Kelly Mill Road, Cumming, Georgia. Ms. Pancione's vehicle left the road and struck Leo, knocking him 20-50 feet. His father, Jose, tried to catch him, breaking his own right leg doing so. Leo died from his injuries three days later. Ms. Pancione sped from the scene, despite the fact she had hit and likely killed a child. Later, she was found at her boyfriend's home, was arrested and subjected to a blood-alcohol test.

Based on her BAC level three hours after the accident, Ms. Pancione must have been noticeably intoxicated at Texas Roadhouse. She struck Leo Camacho five minutes after leaving the bar/restaurant. Ms. Pancione's level of intoxication at the time she was at Texas Roadhouse had to have manifested itself in a visible and noticeable state of intoxication. Moreover, based on her Huntington's disease, it is not plausible that she could have spent 14-17 minutes at Texas Roadhouse without demonstrating symptoms of Huntington's that are consistent with and similar to signs of intoxication. Finally, Ms. Pancione's severely erratic driving within five minutes after leaving Texas Roadhouse appeared to multiple witnesses that she must have been intoxicated while driving.

The Defendant contends that Ms. Pancione only had one beer at Texas Roadhouse and did not show signs of intoxication. Defendant relies on Ms. Pancione's family and boyfriend to testify that they did not observe her drinking alcohol before the wreck that took Leo Camacho's life. Plaintiffs contend a jury will determine that Ms. Pancione was in a noticeably intoxicated state and knew or

should have known she was about to drive, and that the service of another beer was a proximate cause of the incident.

**Applicable Rules, Regulations, Standards and illustrative caselaw:**

**Texas Roadhouse Holdings, LLC's Negligence:**

O.C.G.A. § 51-1-40 (Georgia Dram Shop Act, "GDSA")

Subsection (b) provides, in relevant part, that one

> who **knowingly** sells, furnishes, **or serves alcoholic beverages** to a person who is **in a state of noticeable intoxication**, knowing that such person **will soon be driving a motor vehicle**, may become liable for injury or damage [to a third party] caused by or resulting from the intoxication of such ... person when the sale, furnishing, or serving is **the proximate cause of such injury or damage**. (emphasis added).

**Case law**

**Scientific Reliability of BAC**

> The scientific reliability and objectivity of testing for blood alcohol concentration have been recognized by the General Assembly and by the courts. The salient circumstance in this case is the forensic analysis of a substantially contemporaneous blood sample, placing Greene's blood alcohol level at 0.18 grams percent. This is direct proof that her motor skills should have been degraded. In our view, that fact distinguishes this case from precedents where circumstantial evidence of subsequent intoxication was insufficient to rebut direct and uncontradicted evidence that a person was not noticeably intoxicated when last served alcohol. *Hulsey v. Northside Equities, Inc*., 548 S.E.2d 41, 44 (Ga. Ct. App. 2001), aff'd, 567 S.E.2d 4.

**Direct vs. Circumstantial Evidence**

> Where direct and positive testimony is presented on an issue, the opposing party must show some other fact which contradicts the testimony. If this other fact is direct evidence, that is sufficient to allow

the case to go to the jury; if the other fact is circumstantial evidence, it must be inconsistent with the defendant's evidence, or if consistent, it must demand a finding of fact on the issue in favor of the plaintiff. *Brinbrey et al v. Yirga*, 535 S.E.2d at 794 (quoting Michelin Tire Corp. v. Irving, 366 S.E.2d 156, 157 (Ga. Ct. App. 1988).

"Courts and juries are not bound to believe testimony as to facts incredible, impossible, or inherently improbable. Great physical laws of the universe are witnesses in each case, which cannot be impeached by man, even though speaking under the sanction of an oath." *Hulsey*, citing *Patton v. State*, 117 Ga. 230, hn. 5, 43 S.E. 533 (1903).

Plaintiffs contend that a jury could find the testimony from Defendant witnesses, including Pancione's family and the bartender, Cheyenne Lee, inherently improbable when juxtaposed with the objective and reliable scientific evidence, which is the strongest circumstantial evidence that the nature of the case will admit. See generally *Hulsey* at 548

### Land Based Bars like Texas Roadhouse

> In the commercial setting, the General Assembly certainly intended that the owners of bars, restaurants and similar businesses would be subject to potential liability under the GDSA. The customers of such purveyors of alcohol necessarily travel to and from the establishment by some land-based means of transportation, so that financial viability often depends on the accessibility of the premises by motor vehicle. A clear proximate connection thus exists between such businesses and motor vehicular traffic. *Delta v. Townsend*, 614 S.E.2d at 748, 279 Ga. 511 at 514.

### Foreseeability

Therefore, the clear intent of the General Assembly is to impose civil liability only on that limited class of suppliers of alcohol who had reason to know that the consumer will be driving a vehicle shortly after being served.

> [W]here one provides alcohol to a noticeably intoxicated [individual] knowing that he will soon be driving his car, it is foreseeable to the provider that the consumer will drive while intoxicated and a jury would be authorized to find that it is foreseeable to the provider that the intoxicated driver may injure someone.

514 *Sutter v. Hutchings*, 254 Ga. 194, 198(1), 327 S.E.2d 716 (1985).

[w]here one provides alcohol to a noticeably intoxicated individual knowing that he will soon be driving his car, it is foreseeable to the provider that the consumer will drive while intoxicated and a jury would be authorized to find that it is foreseeable to the provider that the intoxicated driver may injure someone.

(Citation and punctuation omitted.) *Shin*, citing *Delta Airlines v. Townsend*, 279 Ga. 511, 513(1), 614 S.E.2d 745 (2005)

[I]n light of the use of automobiles and the increasing frequency of accidents involving drunk drivers, . . . the consequences of serving liquor to an intoxicated person whom the server knows or could have known is driving a car, is reasonably foreseeable." Elsperman v. Plump, 446 N.E.2d 1027, 1030 (Ind. Ct. App. 1983) (citation omitted).

**Exclusive Remedy**

6

A cause of action under OCGA § 51–1–40(b) is an injured person's exclusive remedy for seeking to impose liability on a provider of alcohol for damages caused by a driver who consumed the alcohol. *Delta Airlines v. Townsend*, 279 Ga. 511, 513(1), 614 S.E.2d 745 (2005).

**"Soon" defined**

"Will soon be driving a motor vehicle." "Soon" means "[i]n the near future; shortly." The American Heritage Dictionary (2d College Edition), p. 1165. *Delta v Townsend* at 748

**Direct Access to Cars**

Because the patrons of land-based establishments serving alcohol generally have direct and immediate access to their vehicles, liability should attach to an owner who knew or should have known that a departing intoxicated customer would shortly be driving. See *Griffin Motel Co. v. Strickland*, 223 Ga.App. 812, 814(2), 479 S.E.2d 401 (1996).

**Land Based/Proximate Cause**

Construing O.C.G.A. § 51–1–40(b) strictly, we conclude that, in enacting the GDSA, the General Assembly intended to abrogate the common law principle that the negligent driver is the sole proximate cause of injuries resulting from his inebriated condition only in the limited case of a traditional land-based supplier of the alcohol. *Delta v. Townsend* at 749.

**Constructive Knowledge**

"[I]n light of the use of automobiles and the increasing frequency of accidents involving drunk drivers, ... the consequences of serving liquor to an intoxicated person whom the server knows or could have known is driving a car, is reasonably foreseeable." [Cit.] *Delta v Townsend* at 749 citing, *Elsperman v. Plump*, 446 N.E.2d 1027, 1030 (Ind.Ct.App.1983).

It is a long-standing rule that the Act does not require that the person selling, furnishing, or serving alcohol have actual knowledge that the patron was soon to drive. "Rather, if a provider in the exercise of reasonable care should have known both that the recipient of the alcohol was noticeably intoxicated and that the recipient would be driving soon, the provider will be deemed to have knowledge of that fact." *Becks v. Pierce* 282 Ga. App. 229, 638 S.E.2d 390, 2006 at 393.

The Supreme Court has held that "[i]f one in the exercise of reasonable care should have known that the recipient of the alcohol ... would be driving soon, he or she will be deemed to have knowledge of that fact." *Riley*, supra at 655, 436 S.E.2d 659. The Court further stated that "a construction of the Act requiring actual knowledge would render the Act an ineffective sanction, since only when the defendant admitted its own knowledge could the plaintiff prevail." (Emphasis in original). Id. at 654, 436 S.E.2d 659. *Griffen* at 404.

**Reasonable care**

Mayes' affidavit establishes only that she does not recall selling alcohol to McQuithy: it does not establish that she exercised such reasonable care to determine whether McQuithy was underage and would soon be driving as to negate constructive knowledge thereof on the part of appellee. *Riley v H&H Operations* 263 Ga. 652, 436 S.E.2D 659, 1993 at 662

**Other Cases**

The scientific reliability and objectivity of testing for blood alcohol concentration have been recognized by the General Assembly and by the courts. The salient circumstance in this case is the forensic analysis of a substantially contemporaneous blood sample, placing Greene's blood alcohol level at 0.18 grams percent. This is direct proof that her motor skills should have been degraded. In our view, that fact distinguishes this case from precedents where circumstantial evidence of subsequent intoxication was insufficient to rebut direct and uncontradicted evidence that a person was not noticeably intoxicated when last served alcohol. *Hulsey v. Northside Equities, Inc*., 548 S.E.2d 41, 44 (Ga. Ct. App. 2001), aff'd, 567 S.E.2d 4.

**Retrograde Extrapolation**

Blood alcohol readings are not only direct evidence of an impaired driver's BAC at the time it is measured, but also circumstantial evidence of the impaired driver's BAC earlier in the day. See, e.g., *In re Dale*, 199 B.R. 1014, 1017–18 (Bankr. S.D. Fla. 1995) (BAC reading of 0.10 supported expert inference that the driver's

BAC was around 0.17 at the time of the collision four hours earlier); *Hulsey*, 567 S.E.2d at 5, 275 Ga. at 364 (BAC reading of 0.18 taken two hours after driver was served supported extrapolation as high as 0.21 at the time of collision). Even where an impaired driver testifies that she drank alcohol after being served by a dram shop defendant, these extrapolations remain probative of her intoxication beforehand. See *Dale*, 199 B.R. at 1018.

**Expert Testimony**

When coupled with expert testimony indicating the level of impairment concomitant with an impaired driver's extrapolated BAC at the time she was served, this evidence is sufficient to contradict testimony that the driver was not noticeably intoxicated. As the Supreme Court of Georgia has explained:   The evidence that [Pancione] was not noticeably intoxicated [is] not uncontradicted because the expert testimony [is] that a woman with [Pancione's] blood alcohol level would have exhibited manifestations of intoxication. Since the direct evidence [is] not uncontradicted, the inference to be drawn from the circumstantial evidence ha[s] probative value and, coupled with the conclusive presumption in O.C.G.A. § 40 6 391(a)(5) that a person with a blood alcohol level less than half of [Pancione's] is impaired, [is] sufficient to create a question of fact whether [Pancione] was noticeably intoxicated when she was served alcohol at [Texas Roadhouse].*Hulsey*, 567 S.E.2d at 5.

Experts "opined that various manifestations of intoxication would appear at that level," the contradictory evidence created a question of fact for a jury to resolve. Id.

**Known BAC**

"The scientific reliability and objectivity of testing for blood alcohol concentration have been recognized by the General Assembly and by the courts. The salient circumstance in this case is the forensic analysis of a substantially contemporaneous blood sample, placing Greene's blood alcohol level at 0.18 grams percent. This is direct proof that her motor skills should have been degraded. In our view, that fact distinguishes this case from precedents where circumstantial evidence of subsequent intoxication was insufficient to rebut direct and uncontradicted evidence that a person was not noticeably intoxicated when last served alcohol". *Hulsey v. Northside Equities, Inc*., 548 S.E.2d 41, 44 (Ga. Ct. App. 2001), aff'd, 567 S.E.2d 4.

**Actual Knowledge Not Required**

"It is a long-standing rule that the [Georgia Dram Shop] Act does not require that the person selling, furnishing, or serving alcohol have actual knowledge that the patron was soon to drive. Rather, if a provider in the exercise of reasonable care should have known both that the recipient of the alcohol was noticeably intoxicated and that the recipient would be driving soon, the provider will be deemed to have

knowledge of that fact." Becks v. Pierce, 638 S.E.2d 390, 393, 282 Ga. App. 229, 233 (Ga. Ct. App. 2006) (emphasis added) (citation omitted)

**Plaintiffs' Damages**:

Plaintiffs are seeking the following damages:

(1) Leo Camacho's pre impact fright. Plaintiffs intend to ask for no less than two million dollars for this claim. As determined by the jury. O.C.G.A. §51-12-12.

(2) Leo Camacho's post impact pain and suffering. Plaintiffs intend to ask for five million dollars for this claim. As determined by the jury. O.C.G.A. §51-12-12.

(3) Medical Expenses of Leo Camacho, Special Damages/Estate claim: $191,124.24.

(4) Funeral Expenses of Leo Camacho, Estate Clam/Special damages: $7,462.75, funeral Home, $3,555.00.

(5) Full value of the life of Leo Camacho, to himself with no deductions for life's expenses. O.C.G.A. §51-4-1.

   i. Economic damages, what Leo would have earned in his lifetime, including wages, fringe benefits and household services. Plaintiffs do not have an economist but intend to ask the jury for an amount based Bureau of Labor and Statistics and the Annuity Mortality Table 1949 ultimate, as determined by a jury. *Seaboard Coast Lines R. Co. v. Duncan* 123 Ga app 479, 181 S.E. 2d 535 (1971). Plaintiffs intend to ask for ten million dollars for this claim

   ii. Non-economic damages, what Leo's life was worth to Leo, as determined by a jury. *Western & A.R. Co. v. Jarrett*, 22 Ga. App. 313, 96 S.E.2d 17 (1918). Plaintiffs intend to ask for twenty million dollars for this claim

(6) Past Medical Expenses of Jose Camacho: $147,034.98. O.C.G.A.

§ 51-12-7.

(7) Past Lost Wages of Jose Camacho, special damages, $180.00 per day, six days a week for 47 weeks=$50,760.00.

(8) Past and Future physical Pain and Suffering for Jose Camacho in an amount to be determined by the jury. Plaintiffs intend to ask for two million dollars for this claim.

(9) Jose Camacho's diminished capacity to labor (an element of pain and suffering), as determined by the jury, not less than 1 million dollars.

(10) Jose Camacho's emotional, psychological and mental pain and suffering for witnessing the fatal pedestrian strike of his son, trying to catch him (and breaking his leg in the process) and waiting by his hospital bed for three days before he passed. This claim is also known as "negligent infliction of emotional distress in witnessing the mortal injury of his child", "emotional distress in witnessing child's suffering and death", "Zone of Impact", "Georgia's Impact Rule". Plaintiffs intend to ask for fifty million dollars for this claim. *Lee et al v. State Farm Mutual Insurance Company et al*. 272 Ga. 583, 533 S.E.2d 82 (2000).

(11) Daniela Torres-Camacho's loss of consortium claim is a derivative, but separate claim from Jose Camacho's personal injuries and his emotional and psychological injuries from witnessing his son's mortal injury and subsequent death, three days later. O.C.G.A. §9-3-3. The measure of damages is determined by a jury based on the impact to the marital relationship, based on the severity of the injuries. Plaintiffs intend to ask for five million dollars for this claim.